Bertha GREENE et vir, Appellants,

v.

Rufus WATTS et al. (Re: Estate of Lee W. Oliver, Deceased), Appellees,

No. 15577.

Court of Civil Appeals of Texas.

Dallas.

Feb. 12, 1960.

Golden, Croley, Howell, Johnson & Mizell, and Donald G. Canuteson, Dallas, and Sam W. Davis, Houston, for appellants.

Akin & Vial, Dallas, for appellees.

CRAMER, Justice.

This is a will contest. Lee W. Oliver, a colored male, 67 years of age on or about August 11, 1954, in his own handwriting wrote on at least two pieces of paper, one of which (Exhibit 6) was offered for probate as his holographic last will and testament. Thereafter on October 27, 1954, he died and his holographic will, dated August 11, 1954, was admitted to probate as his last will, by the Probate Court of Dallas County, on December 16, 1954. The instruments offered in evidence here as a will were as follows: Photostatic copy of the instrument offered as the last will of Lee W. Oliver, Exhibit 6, which was probated by the Probate Court on May 27, 1955, was marked and attached to the Statement of Facts.

The County Court judgment was appealed to the District Court and after a trial de novo the jury found in answer to the single issue (Tr. p. 21) submitted to them, as follows: "Do you find from a preponderance of the evidence, that the deceased, Lee W. Oliver, did not possess testamentary capacity, as that term is defined to you herein, at the time of the execution of the instrument dated August 11, 1954, and offered for probate as his last will and testament?" Answer: "He did not possess testamentary capacity."

On such verdict the trial court entered the judgment here appealed from which set aside the judgment of the Probate Court admittng the instrument involved to probate, and denied the probate of the will of Lee W. Oliver, deceased and taxed the costs against Bertha Greene and her husband.

From such judgment this appeal to this Court has been duly perfected.

Appellants here brief five points of error.

Points 1 through 4, briefed together, assert in substance error (1) *in overruling proponents' motion for instructed verdict* presented at the conclusion of all the evidence because there was *no evidence of sufficient probative value to justify the submission of the issue of testamentary capacity of Lee W. Oliver at the time* of the executing of the will; (2) in entering judgment for appellees when there was *no evidence of probative force upon which the verdict of the jury could have been based*; (3) in entering judgment for appellees, because the verdict of the jury was contrary to the evidence in that the great weight and preponderance of the evidence showed that at the time of executing the instrument dated August 11, 1954, and offered for probate as his last will and testament, Lee W. Oliver, deceased, possessed testamentary capacity as that term was defined by the jury; (4) in entering judgment for appellees because the verdict is not supported by sufficient evidence since all testimony offered in support of the alleged lack of testamentary capacity of Lee W. Oliver, deceased, was based upon ob-

servations too remote in time from the execution of the instrument dated August 11, 1954, and offered for probate as his last will and testament; therefore did not constitute evidence of a probative value as to the testamentary capacity of said deceased on that date.

Points 1 through 4 are countered in substance, (1) The trial court properly overruled appellants' motion for instructed verdict presented at the close of the testimony because there was ample evidence of probative force that Lee W. Oliver lacked testamentary capacity at the time inquired about. (2) The evidence abundantly supports the jury finding that testator lacked testamentary capacity at the time in question and the court correctly entered judgment upon the verdict. (3) The court correctly entered judgment for appellants based on the verdict because the overwhelming weight and preponderance of the evidence showed testator lacked testamentary capacity at the time in question. (4) The court correctly entered judgment for appellees based on the verdict of the jury which was supported by ample evidence of testamentary incapacity, both lay and expert, concerning events immediately before and after August 11, 1954, which came into evidence without objection by appellants concerning remoteness or relevancy.

Points and counterpoints 1 through 4 raise only the question of the sufficiency of the evidence on the issue of testamentary capacity of the testator, Lee W. Oliver, deceased, at the time the instrument offered in evidence as a will was personally executed by Lee W. Oliver, deceased, and witnessed by two qualified disinterested witnesses.

We will consider the evidence first as to whether or not it is sufficient to raise the only issue submitted for the tryor of the facts, to wit; testamentary capacity, at the time of the execution of such instrument.

As stated in 44 Tex.Jur. 571, Sec. 31, "The rule in Texas is that the burden is on the proponent to show by positive evidence, at the time he seeks to have the will probated, that the testator was possessed of mental capacity at the time the will was executed, sufficient to make a valid will." 44 Tex.Jur. 571; Wills, Sections 31 and 32, a preponderance of the evidence being the test in answering the issues on testamentary capacity.

The record shows Dr. Ellen Loeb's testimony as the only expert witness to testify, was challenged by Bertha Greene, asserting some of her answers on cross examination destroyed any probative force and effect attributed to her as a witness on direct examination. Asserting also that appellees must stand or fall on the testimony of Dr. Loeb and that at best, her testimony does no more than raise a suspicion of incapacity.

Dr. Loeb testified as to her qualifications as a Doctor, and that she was the author of the Veteran's Administration Hospital written records during the seven days admission of Lee W. Oliver in that hospital from October 20, 1954 through October 27, 1954, the day he died. When she examined Oliver on October 20, 1954, she found:

"A well developed, poorly nourished colored male, blood pressure 220/120, whose sensorium was very cloudy—he was able to answer if directly questioned but he was confused as to time, place and date—there was marked arterial constriction bilaterally and tortuousity of the veins, more so on the right—breath sounds were very faint—cranial nerves were active except for right facial paralysis—the trunk protruded on the left—deep tendon reflexes in the left were hyperactive in the left arm and were somewhat diminished in the left leg—Babinski was very difficult to test because the left toe was bent toward the head and did not move on stimulation—*because of the patient's confusion, it was not possible to do any sensory tests*—there was marked weakness of the left

leg and questionable paralysis of the left arm".

Dr. Loeb's testimony and written report stated, concerning his last illness, that in his hospital course he became more and more stuporous and finally he was unable to swallow, and that her diagnosis was hypertensive cardio-vascular disease and encephalomalacia due to thrombosis. There was in evidence facts on first admission of Oliver to the Veteran's Hospital at McKinney in 1953, included in Parkland Hospital records. The 1953 record discloses that about one year prior to the "Will", Oliver was hospitalized about two and one half months, during which time it was discovered that he had a pronounced paralysis of the left arm and was unable to use the biceps muscles whatsoever. His left leg was noted to be weaker than the right, his tongue deviated to the right, he had a left-sided facial weakness; and he tended to fall toward the left side when he attempted to walk.

Parkland's record also show a report of the diagnostic x-ray consultation from Parkland Hospital as follows:

"Skull Series: Three standard projection of the skull reveal moderate soft tissue swelling over the left side of the skull. No fractures or intracranial calcifications can be identified. The sella turcica and petrous ridges appear normal. The patient appears to be edentuious with dentures and in the maxilla there is a calcific density thought to be an undescended tooth."

The final diagnosis in the V. A. Hospital when he left there on July 29, 1953 was:

"1. Hypertensive cardiovascular disease. (Treated, imp.)
    a. Cardiac enlargement.
    b. Cardiac insufficiency.
    c. Activity slightly limited.
"2. Encephalomalacia, due to thrombosis.
"3. Arteriolar nephrosclerosis
    2. Axotemia

"Operations: 1. Left stella block. July 20, 1953."

On cross examination, material here, Dr. Loeb also testified that based on her examination and treatment of Lee W. Oliver, now deceased, in October 1954, Lee W. Oliver was not a person of unsound mind.

Naomi Favors, a widow, a school teacher, with a Master's Degree and teacher's certificate, testified in substance, that she was an eye witness to testator signing the will; that before Oliver signed his will; and before he had his series of strokes, he was a quiet man, who did not talk about his business when he lived with her; but when he was in ill health he confided to her, also that she had known Lee Oliver for some 21 or 22 years; he lived across the street from her; she had a sister he went with; she kept up her acquaintance with him from that time until he died, about October 27, 1954, in the Veteran's Hospital in McKinney, Texas. The last year of his life he lived upstairs in her house, she lived downstairs. He worked at the colored Elks Lodge; was Treasurer. She understood he had treatments. She had not heard him express any affection towards any of his aunts or uncles; they talked frequently over the situation most every night when he came from the Lodge. She remembered Lee Oliver writing a will shortly before his death; he asked her to sign as a witness. At that time he asked her to sign as a witness. At that time he was of sound mind, she did not observe anything in his conversation, and the actions of the Lee Oliver that indicated he didn't know what he wanted done with his property or who he wanted to leave it with in case of his death. He was positive he wanted to leave it to his cousin. She saw nothing in his conversation or in his actions that indicated that he was of * * * he didn't know what he wanted done with his property, or who he wanted to leave it with, or to in case of his death; he was always positive he wanted it left to his cousin. She "saw him write every bit of this will, he was sitting at the desk in

her living room downstairs here in Dallas, around 2 o'clock, somewhere in that neighborhood. He called her in to see him write his will. He said he wanted everything he possessed to go to his cousin, Bertha Greene of Houston, Texas, and gave her his telephone and house number. A. In Houston. Q. In Houston. Did he give you any other direction with reference to getting in touch with Bertha if anything happened to him? A. He told me if anything happened at any time, to get in touch with Bertha Greene, and the night of his last illness, when I found him ill upstairs, the first thing he told me was to get in touch with her right away. Q. Did he use any expression of endearment, in describing his relations to and affection for Bertha Greene? A. At all times."

Under the above record we are of the opinion the evidence was sufficient to make a question of fact as to whether or not the testator did or did not possess testamentary capacity, and therefore we must overrule points 1 through 5, and affirm the trial court's judgment.

It is so ordered.

DIXON, Chief Justice.

I concur in affirming the judgment.
Following the death of Lee Oliver in 1954 his cousin Bertha Greene, appellant here, joined by her husband, offered for probate an alleged holographic will which reads as follows:

"8–11–54

"To whom it may consern I Lee Oliver give you the wright if any thing should happen to me to contact Mrs. Bertha Green 2702 Ruth st Houston Texas take out what ever I owe you give the rest to her
Lee Oliver."

The probate of the above instrument was contested by Rufus Watts, Amanda Watts Hayes, and Mary Watts Jones, uncle and aunts of the deceased, and appellees here. The instrument was admitted to probate in the County Court.

In a trial de novo in the District Court in answer to the only question submitted a jury found that Lee Oliver did not have testamentary capacity at the time of the execution of the alleged holographic will. The trial court accordingly entered judgment denying probate of the document.

In their first two points on appeal appellants assert that there was no evidence to justify submission of the issue to the jury, and no evidence of probative force upon which the verdict of the jury could have been based. In her third and fourth points she contends that the verdict of the jury was contrary to the evidence in that the great weight and preponderance of the evidence showed that the deceased did have testamentary capacity at the time in question; and the verdict of the jury is not supported by sufficient evidence since all testimony offered in support of appellees' contention was based on observations too remote in time from the date of execution of the alleged will. These four points will be considered together.

Hospital records show that Lee Oliver was treated for numerous ailments as an out-patient over a period of about nine years. He was hospitalized for about two and a half months beginning May 14, 1953 and again from October 20, 1954 until October 28, 1954, the day he died in the Veteran's Hospital at McKinney, Texas.

The records from the Veteran's Hospital and from Parkland Hospital in Dallas, in connection with his first hospitalization show that he had a paralysis of the left arm, a weakness in his left leg, and on the left side of his face, and that his tongue deviated to the right. His history showed high blood pressure for nine years. The medical diagnosis of July 20, 1953 was:

"1.  Hypertensive cardiovascular. disease.
   a. Cardiac enlargement
   b. Cardiac insufficiency
   c. Activity slightly limited
"2.  Encephalomalacia, due to thrombosis
"3.  Arteriolar nephrosclerosis
   a. Axotemia."

When he was admitted to the hospital the second time on October 20, 1954, he had a partial aphasia with marked mental confusion. He did not know where he was.

The witness Harold Lloyd Pickett, a distant cousin, testified that all his life he had known deceased. Prior to his illness Lee Oliver had been a good business man, dealing at times in South Texas oil leases. Beginning about 1948 he began losing weight. In July 1954 Lee Oliver visited in Houston for two or three weeks, and the witness saw him every day. His left arm and leg were paralyzed and his speech was defective. I quote from his testimony:

"* * * he would start talking about something, I was drawing or working on, and he would change his thought to something that happened out in the country on the old home place, you know, and about how sick he had been, just like jabber, jabber, jabber, jabber, like that."

With reference to Lee Oliver's mental condition, I also quote from Pickett's testimony:

"Well, as to the soundness of his mind, I wouldn't say he was crazy, but I would say that he wasn't himself, he was awfully slow, his reflexes were slow, his speech, his train of thought wouldn't hold, his original train of thought, what he would start saying and what he would end up saying, he wasn't the same man.

"Q. He wasn't the same man. Well, would your opinion be then— what would your opinion be then?

"A.  Well, I wouldn't say he was of sound mind, although I wouldn't say he was not, you know totally insane."

Another witness was Doctor Ellen Loeb, a specialist in internal medicine and hemotology. She was an attending physician at the Veteran's Hospital at McKinney, Texas during Lee Oliver's second hospitalization and his last illness. She testified that Lee Oliver had a brain lesion on both the left and right sides of the brain. He had encephalomalacia due to thrombosis, which means that the blood supply was diminished causing a generalized softening of the brain. That condition had commenced at least a year prior to her first seeing the patient on October 20, 1954. He had arteriosclerosis, which is a slowly progressing and degenerating disease. She testified that in her opinion, based on her examination and treatment of Lee Oliver in October 1954, he was not of sound mind when he signed the alleged will of August 11, 1954. We quote her testimony:

"* * * Do you have an opinion as to the condition of his mind?  A. When?

"Q.  At August of '54, that would be two months before you saw him?  A. Yes.

"Q.  I realize that—  A.  Yes.

"Q.  And what would that opinion be?  A.  As I say, I don't think he was of sound mind, that is the best we could establish it.  * * *

"Q.  Speaking then from all medical probability, is it your opinion then, he being not a person of sound mind, would be a person of unsound mind, is that right?  A.  Yes."

In behalf of appellants Naomi Favors testified that Lee Oliver rented a room at her house. She saw him write the alleged holographic will. At the time he owed her some money, but she did not cause him to write the will. She put the instrument in a book and it remained in her possession, though Lee Oliver kept his bank books and personal papers in his room in a drawer. She testified that in her opinion Lee Oliver was of sound mind when he wrote the will.

J. R. Lindquist, banker, testified that Lee Oliver on August 10, 1954 borrowed $96 from the bank, though he could have withdrawn that amount from his account without paying interest. He had known Lee Oliver about ten years. Based upon conversation and observation he was of the opinion that Lee Oliver was a person of sound mind.

An autopsy was made and the report confirmed that Lee Oliver had suffered from the various ailments named in the hospital records.

From the above brief summary it will be seen that the evidence was conflicting on the question of Lee Oliver's condition. But the evidence offered by contestants is sufficient to support the jury's verdict that deceased lacked testamentary capacity. Consequently the verdict was binding on the trial court and is binding on this court. 44 Tex.Jur. 571; Walston v. Mabry, Tex.Civ.App., 225 S.W.2d 1014. It is true that neither the witness Pickett nor the witness Doctor Loeb saw deceased on the day he wrote the alleged will. But Pickett saw him a number of times about a month before the execution of the document, and Doctor Loeb saw him daily for several days during a period about two and a half months after its execution. This was not too remote in time to be of probative value. Singleton v. Carmichael, Tex.Civ.App., 305 S.W.2d 379; Hickman v. Hickman, Tex.Civ.App., 244 S.W.2d 681.

I concur in overruling appellants' first four points on appeal.

In their fifth point on appeal appellants claim that the admission in evidence of the records of the Veterans' Hospital at McKinney, Texas, was in violation of Art. 3731a, Vernon's Ann.Civ.St. in that copies of such records had not been delivered to appellants a reasonable time before trial, and appellants were unfairly surprised.

I see no merit in appellants' contention. When the question came up during the trial the attorney for appellees informed the court that these same records had been introduced at the trial in County Court at which time appellants' counsel had ample opportunity to inspect them. In reply to this statement appellants' counsel stated that he remembered the 1953 and 1954 hospital reports but did not remember the autopsy report. The court accepted the word of appellants' counsel but admitted the records in evidence without prejudice to appellants' right to withdraw their announcement of ready for trial. However the record does not reveal any request for leave to withdraw appellants' announcement.

The statute does indeed provide that the writing shall be admissible only if a copy has been delivered to the adverse party within a reasonable time before trial, but it expressly qualifies the rule: " * * * unless in the opinion of the trial court the adverse party has not been unfairly surprised by the failure to deliver such copy." The court in this instance obviously did not believe that appellants had been unfairly surprised. Appellants' fifth point is properly overruled.

For the reasons above stated I concur in affirming the judgment of the trial court.

YOUNG, Justice.

I join in above concurring opinion of Chief Justice DIXON.